IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

KRYSTEN GARNER, *on behalf of*      *
*minor R.C. and the Estate of*
*Andrew Campbell*,                  *

    Plaintiff,                    *

vs.                                 *       CASE NO. 4:22-CV-94 (CDL)

ANTONIA JAMERSON, *et al.*,         *

    Defendants.                   *

_____

O R D E R

Andrew Campbell died by suicide inside a solitary confinement cell while he was imprisoned at Rutledge State Prison. Plaintiff Krysten Garner brought this action on behalf of Campbell's estate and his surviving minor child pursuant to 42 U.S.C. § 1983. She alleges that Defendants were deliberately indifferent to Campbell's risk of suicide. Presently pending before the Court are Defendants' motions to dismiss. For the reasons set forth below, the Court denies Defendants' motions to dismiss (ECF Nos. 20 & 24).

MOTION TO DISMISS STANDARD

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must include sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In other words, the factual allegations must "raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claims. *Id.* at 556. But "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556).

FACTUAL ALLEGATIONS

The Court accepts the following factual allegations as true for purposes of deciding the pending motions to dismiss.  Andrew Campbell was a former United States Marine who became disabled during deployment in Afghanistan and suffered from mental illness when he returned to the United States.  In April 2020, he was an inmate at Rutledge State Prison, which is operated by the Georgia Department of Corrections ("GDC").  GDC personnel, including Defendants, knew that Campbell was at a high risk of suicide.  Compl. ¶ 19, ECF No. 1.  GDC personnel placed Campbell in a single-inmate solitary confinement cell in Rutledge's G-Building, a special housing unit that has thirty beds and two security surveillance cameras. *Id.* ¶¶ 20-22.  On April 2, 2020,

G-Building was staffed by two people: GDC Correctional Officer Antonia Jamerson and GDC trainee Cadet Warren Baltes.  *Id.* ¶ 23. Their supervisors were Lieutenant Justin Mock and Lieutenant Lowell Clark.  Mock and Clark were responsible for staffing in the G-Building, as well as for the supervision of Jamerson and Baltes.  *Id.* ¶ 24.  Lieutenant Douglas Pernell was the acting captain of the prison on April 2, 2020.  He was responsible for the prison's operation, including staffing and the supervision of Jamerson, Baltes, Mock, and Clark.  *Id.* ¶ 26.  Pernell's supervisor was Warden Reagan Black, who was responsible for prison operations and prison staff at Rutledge.  *Id.* ¶ 42. Scott Crickmar was the regional director responsible for the operation of prisons in GDC's southwest region, including Rutledge.  *Id.* ¶ 43.  Timothy Ward was the commissioner of GDC, and he was responsible for the operation of all GDC prisons, including Rutledge.  *Id.* ¶ 44.

On April 2, 2020, Campbell was imprisoned in a single-inmate solitary confinement cell.  Jamerson and Baltes knew that Campbell was a high suicide risk and that he was on a suicide safety protocol which required that he be observed every fifteen minutes.  *Id.* ¶¶ 50-51.  According to the allegations in the Complaint, they both knowingly failed to conduct safety observations of Campbell on April 2, 2020.  *Id.* ¶ 52.  On the evening of April 2, Jamerson discovered Campbell in his cell,

dead from hanging himself with a sheet tied to the bars of his cell door window. *Id.* ¶ 28. Had Jamerson and Baltes made a cursory round within the housing unit without even looking into his cell, they would have noticed Campbell tying a sheet through the bars of his cell door. *Id.* ¶¶ 29, 53. Jamerson and Baltes did not discover Campbell until long after he was already dead. *Id.* ¶ 54. It was later discovered that Jamerson falsified the observation logs to try to cover up his failure to conduct the required safety rounds. *Id.* ¶ 32.

At the time of Campbell's death, Mock, Clark, and Pernell were responsible for staffing and operation of the G-Building. *Id.* ¶ 58. They knew that the G-Building housed inmates in solitary confinement and on suicide protocols who required frequent, regular observations. *Id.* ¶¶ 59-60. Rutledge had a suicide safety protocol that required safety observations of high suicide risk inmates every fifteen minutes. *Id.* ¶ 51. Plaintiff alleges that when only an officer and a trainee were on duty in G-Building, it was not possible to follow Rutledge's suicide safety protocol by conducting safety checks every fifteen minutes. *Id.* ¶ 30. According to Plaintiff's factual allegations in the Complaint, Mock, Clark, and Pernell knew that G-Building did not have enough staff to adequately provide for the safety of the inmates, but they did nothing to remedy the deficiency. *Id.* ¶¶ 61-63. Plaintiff also alleges that Mock,

Clark, and Pernell knew that the G-Building correctional
officers did not conduct adequate inmate safety observations of
inmates with a known risk of danger, and they never corrected
the officers to ensure that they conducted adequate safety
observations. *Id.* ¶¶ 62-63.  Finally, Plaintiff alleges that
Mock, Clark, and Pernell knew of a history of widespread abuse
that included overuse of solitary confinement and lack of inmate
safety observations, but they failed to do anything to correct
these issues. *Id.* ¶ 63.

At the time of Campbell's death, Black, Crickmar, and Ward
were responsible for all operations at Rutledge, including
policies, staffing, and employee supervision. *Id.* ¶ 66.
Plaintiff alleges that these supervisory officials knew that
Rutledge was grossly understaffed to the point that inmates'
safety could not be reasonably assured and that Rutledge
correctional officers lacked appropriate supervision and
training on suicide prevention and intervention. *Id.* ¶¶ 67-68.
Plaintiff also alleges that these three supervisory officials
knew that Rutledge correctional officers routinely failed to
conduct adequate safety observations of high-risk inmates, yet
they did nothing to ensure that correctional officers performed
adequate safety checks. *Id.* ¶ 68.

DISCUSSION

Plaintiff sues Defendants in their individual capacities, claiming that they were deliberately indifferent to a known risk of serious harm to Campbell in violation of the Eighth Amendment. Defendants seek to dismiss all of Plaintiff's claims, arguing that Plaintiff did not adequately allege a violation of Campbell's constitutional rights and that even if she did, each Defendant is entitled to qualified immunity.[1]

To state a claim in a prisoner suicide case under the Eighth Amendment, the plaintiff must allege sufficient facts that plausibly show that the prison official "displayed *deliberate indifference* to the prisoner's taking of his own life." *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015) (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir. 1989)).[2] To plausibly allege deliberate indifference, those facts must support the conclusion that the government official

---

[1] "Government officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jackson*, 787 F.3d at 1352 (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1268 (11th Cir. 1999)). There is no present dispute that Defendants acted in their discretionary authority at the time of the events giving rise to this action. The remaining question is whether Plaintiff adequately alleged a constitutional violation and whether any such constitutional violation was clearly established at the time of the incidents giving rise to this action. *Id.*

[2] *Jackson* involved a pretrial detainee whose right to be protected from suicide arose from the Fourteenth Amendment. In jail suicide cases under the Fourteenth Amendment and prison suicide cases under the Eighth Amendment, the same deliberate indifference standard applies. *Jackson*, 787 F.3d at 1353.

had "subjective knowledge of a risk of serious harm [which the official] disregard[ed] . . . by conduct that is more than mere negligence." *Id.* (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

When a defendant sued in his individual capacity raises the defense of qualified immunity, the plaintiff's complaint must not only state a plausible claim of deliberate indifference, but it must be clearly established that under plaintiff's version of the facts, the defendant's conduct amounts to deliberate indifference. *Id.* In making this determination, "[e]ach individual Defendant must be judged separately and on the basis of what that person knows." *Id.* (quoting *Burnette v. Taylor,* 533 F.3d 1325, 1331 (11th Cir. 2008)).

## I.  Plaintiff's Claims Against Jamerson and Baltes

Jamerson and Baltes were the officers on duty in G-Building on April 2, 2020, with direct responsibility for monitoring Campbell.  To establish a deliberate indifference claim against Jamerson and Baltes, Plaintiff must allege facts that show "a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Cagle v. Sutherland*, 334 F.3d 980, 983 (11th Cir. 2003) (per curiam) (emphasis omitted) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir. 1990) (per curiam)).  So, each Defendant must have "subjective knowledge of a strong likelihood that [the prisoner]

would attempt to commit suicide." *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1269 (11th Cir. 2005).  An officer cannot be liable "for the suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk." *Id.* (quoting *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1116 (11th Cir. 2005)).

Jamerson does not dispute that Plaintiff adequately alleged he had subjective knowledge of a strong likelihood that Campbell would commit suicide.  Baltes is not quite as forthcoming.  He contends the Complaint does not sufficiently allege his subjective knowledge because Plaintiff did not allege that Campbell told Baltes about his mental health conditions, asked Baltes for psychiatric treatment, or demonstrated unusual behavior to Baltes.  But Baltes conveniently ignores the relevant factual allegations, which the Court must accept as true for purposes of the pending motions: Plaintiff alleges that both Jamerson and Baltes knew that Campbell was a high suicide risk and that the risk was such that Campbell had been placed on a suicide safety protocol which required regular monitoring. Compl. ¶¶ 50-51.  Thus, for purposes of deciding the pending motions to dismiss, it is established that both Jamerson and Baltes had subjective knowledge of a strong likelihood that Campbell would commit suicide.  Whether this will be the case at

the summary judgment stage remains to be seen. *Cf. Snow*, 420 F.3d at 1267, 1270 (concluding, at the summary judgment stage, that there was a genuine fact dispute on the officer's subjective knowledge because there was evidence that he knew that the inmate had recently attempted suicide and even expressed a concern that the inmate was suicidal).

Baltes's reliance upon *Cook* is misplaced.  In *Cook*, the issue was whether a county sheriff had subjective knowledge of a pretrial detainee's suicide risk.  *Cook*, 402 F.3d at 1116.  The plaintiff in *Cook* did not point to any evidence that the detainee "had previously attempted suicide or had ever been considered a suicide risk," so the sheriff could not have actual knowledge that the detainee might take his own life.  *Id.*  Here, in contrast, Plaintiff alleges that Campbell was considered a high suicide risk at the time of his death, that he had been placed on a suicide safety protocol, and that Jamerson and Baltes knew it.  These allegations are sufficient to support the plausible conclusion that Jamerson and Baltes had subjective knowledge of a strong likelihood that Campbell would commit suicide.

Jamerson and Baltes also misconstrue the allegations in the Complaint to support their argument that they merely violated the Rutledge suicide policy, which is not enough to support a claim of deliberate indifference.  If that were the only

reasonable interpretation of the Complaint, they may have a
winning argument.  Jamerson and Baltes are correct that a "mere
violation of a local government's policy does not necessarily
implicate a constitutional violation."  *Salter for Est. of
Salter v. Mitchell*, 711 F. App'x 530, 540 (11th Cir. 2017)
(citing *Virginia v. Moore*, 553 U.S. 164, 173 (2008)).  But here,
Plaintiff does not allege a mere policy violation.  Rather, she
alleges that both Jamerson and Baltes "knowingly failed to
conduct safety observations" of Campbell on April 2, 2020.
Compl. ¶ 52.  Plaintiff does not simply allege that the two
officers failed to monitor Campbell at fifteen-minute intervals
as Rutledge's policy required them to do.  She also does not
allege that they checked on him within the thirty minutes
preceding his death.[3]  Instead, she alleges that the two officers
did not conduct safety checks on Campbell the night he died;
that if either officer had done a cursory supervision of the
housing unit without even looking into Campbell's cell, they

---

[3] Jamerson appears to argue that he checked on Campbell within thirty
minutes before his death and that such a check is reasonable as a
matter of law under the unpublished panel decision in *Salter*.  First,
Plaintiff does not allege that either officer checked on Campbell
within thirty minutes before his death.  Second, the *Salter* panel did
not address a suicide protocol.  Rather, *Salter* involved an inmate who
had been *removed* from suicide watch and placed on a less restrictive
health watch by order of a physician.  *Salter*, 711 F. App'x at 534-35.
The *Salter* panel found that the officer was not deliberately
indifferent to the inmate's risk of harm because she complied with the
health watch policy and checked on the inmate between seventeen and
twenty-eight minutes before she found him hanging by his neck from a
bedsheet and worked to revive him.  *Id.* at 541.

would have noticed Campbell tying a sheet through the bars of his cell door; and that the officers did not check on Campbell until "long after he was already dead." *Id.* ¶¶ 29, 53-54. These allegations are sufficient to support the conclusion that Jamerson and Baltes subjectively believed that there was a strong risk that Campbell would attempt suicide, yet they deliberately did not take any action to prevent his suicide.

Finally, Jamerson and Baltes argue that it was not their fault that they did not check on Campbell in accordance with the fifteen-minute observation policy. They point to Plaintiff's allegations that Rutledge was chronically understaffed and that the understaffing contributed to Campbell's death. Thus, they maintain that Plaintiff's complaint acknowledges their lack of legal culpability. This argument, like others made by Defendants, only tells part of the story. Plaintiff also alleges that Jamerson and Baltes did not take the action that was within their control—check on Campbell the night he died or conduct cursory supervision of the housing unit. As discussed above, these allegations are sufficient to state a plausible claim of deliberate indifference under the circumstances. But stating a plausible constitutional violation is not enough to overcome the defense of qualified immunity. To do that, Plaintiff's version of what happened must demonstrate that Defendants' conduct violated clearly established law. It has

long been clearly established that deliberate indifference to a serious risk of harm, as alleged under Plaintiff's version of what happened, violates the Constitution. *Snow*, 420 F.3d at 1270. Accordingly, Jamerson and Baltes are not entitled to qualified immunity, and their motions to dismiss are denied.

## II. Plaintiff's Claims Against the Supervisor Defendants

In addition to her claims against the two officers who were on duty in the G-Building at the time of Campbell's death, Plaintiff asserts claims against the officers' immediate supervisors, the officials with management responsibility for Rutledge State Prison, and the Commissioner of the Georgia Department of Corrections. Supervisory officials "are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that district courts may consider either prong of the qualified immunity analysis first) and *Randall v. Scott*, 610 F.3d 701, 703 (11th Cir. 2010) (finding no heightened pleading requirement)). "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the

supervisor's actions and the alleged constitutional violation."
*Id.* at 1047-48. A plaintiff can establish the required causal
connection by demonstrating that the supervisor's custom or
policy results "in deliberate indifference to constitutional
rights" or by showing that a "history of widespread abuse" put
the "responsible supervisor on notice of the need to correct the
alleged deprivation" but the supervisor failed to do so. *Id.* at
1048 (quoting *Cottone*, 326 F.3d at 1360). A plaintiff may also
show a causal connection "when facts support an inference that
the supervisor . . . knew that the subordinates would act
unlawfully and failed to stop them from doing so." *Id.* (quoting
*Cottone*, 326 F.3d at 1360). Where, as here, the supervisor
asserts qualified immunity, the plaintiff must allege facts to
show that the supervisor violated a constitutional right that
was clearly established at the time of the violation. *Id.*

Plaintiff alleges that Mock, Clark, and Pernell were
deliberately indifferent to Campbell's risk of suicide because
they were on duty at Rutledge on the night of Campbell's death,
were responsible for staffing at Rutledge, knew that the
correctional officers were not conducting the required safety
observations, and took no action to ensure inmate safety in G-
Building. Plaintiff alleges that Black, Crickmar, and Ward (who
were not physically present at Rutledge when Campbell died) were
responsible for staffing at Rutledge, knew that Rutledge was

chronically and grossly understaffed, knew that correctional officers at Rutledge routinely failed to conduct adequate safety observations, and knew that inmates' safety could not be reasonably assured with the staffing they approved. The foregoing allegations are factual and not merely conclusory. Thus, they must be accepted as true for purposes of deciding the pending motions.[4]

Defendants argue that Plaintiff merely alleges that the six supervisor Defendants knew about understaffing at Rutledge and did not fix it, which is not enough to establish deliberate indifference. *See Cagle*, 334 F.3d at 987 (finding that county's failure to hire additional night jailer did not support a § 1983 claim against the county where there was no evidence that any detainees were likely to commit suicide); *Popham*, 908 F.2d at 1565 (concluding that there was no city policy not to prevent jail suicide based on the mayor's decision to leave a night guard position unfilled, where there was no evidence that the

---

[4] The Court emphasizes that the factual allegations against all the supervisory Defendants—including Crickmar and Ward, who were responsible for prisons other than Rutledge and did not work onsite at Rutledge as the other Defendants did—are that the supervisory Defendants had subjective knowledge of the situation on the ground at Rutledge and had the power to correct the officers' failure to conduct adequate safety observations. This is not simply a claim that Crickmar and Ward were generally responsible for the overall management of the prison system, so the buck stops with them.  The claim is that they knew that inmates such as Campbell, who were placed on suicide watch pursuant to prison policy, were not being adequately monitored, and they did nothing to provide the high suicide risk inmates with protection. Whether Plaintiff has proof of these claims cannot be decided before discovery.

detainee had any suicidal tendencies).  But Defendants' reading of Plaintiff's factual allegations is too narrow.

Plaintiff alleges that (1) Rutledge regularly housed inmates in the G-Building who were on suicide safety protocols, (2) Rutledge had a suicide prevention protocol requiring safety checks every fifteen minutes for inmates who were on the protocol, (3) the point of the protocol was to decrease the likelihood of suicide and increase the chance for officers to timely intervene in the event of a suicide attempt, (4) Mock, Clark, and Pernell knew that G-Building guards were not conducting adequate safety checks, (5) Black, Crickmar, and Ward knew that Rutledge officers routinely failed to perform adequate safety checks, and (6) it was not possible to follow the Rutledge suicide safety protocol with only an officer and a trainee assigned to G-Building.  Plaintiff also alleges that Campbell was known to be at high risk of suicide such that he was placed on the suicide safety protocol.

Accepting these factual allegations as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must do at this stage in the litigation, the Court is presented with the following version of what happened: The six supervisor Defendants knew there was a serious risk of harm to G-Building inmates who had been placed on the suicide safety protocol; they knew that the Rutledge G-Building officers were not conducting

adequate safety observations; and despite this knowledge, they took no action to assure that G-Building inmates on suicide safety protocol were adequately monitored.   These allegations plausibly state a causal connection between the actions of the six supervisor Defendants and the deprivation of Campbell's Eighth Amendment rights.   For Mock, Clark, and Pernell, a reasonable inference from the allegations is that they knew G-Building officers like Jamerson and Baltes would fail to perform critical safety checks of suicidal inmates but they failed to intervene.   And for all six supervisors, a reasonable inference from the allegations is that they were aware that Rutledge housed inmates with a serious risk of suicide and knew that the officers responsible for monitoring those inmates routinely failed to conduct safety checks.   Despite this knowledge of a widespread pattern of inadequate safety checks, the six supervisors chose to do nothing.   In addition, Plaintiff alleges that the six supervisors knew that G-Building was so understaffed that there were not enough officers to conduct adequate safety checks of high-risk inmates in G-Building, but they decided not to make any staffing adjustments despite the obvious risks.   As discussed above, it was clearly established by April 2, 2020 that taking no action despite knowledge of a serious risk of harm amounts to deliberate indifference that violates the Constitution.   Mock, Clark, Pernell, Black,

Crickmar, and Ward are not entitled to qualified immunity at the pleading stage, and thus their motions to dismiss are denied.

CONCLUSION

For the reasons set forth above, the Court denies the Defendants' motions to dismiss (ECF Nos. 20 & 24).

IT IS SO ORDERED, this 22nd day of December, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA